UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CRIMINAL ACTION NO. 5:18-00081-REW-MAS

UNITED STATES OF AMERICA                                            PLAINTIFF

V.                 **SENTENCING MEMORANDUM**
                           **OF THE UNITED STATES**

**ROSSEN IOSSIFOV**                                         **DEFENDANT**
a.k.a. RGCOINS

\* \* \* \* \*

      ROSSEN IOSSIFOV was a critical money launderer for a sophisticated and international criminal enterprise whose primary aims were to defraud U.S.-based victims and evade law enforcement detection. Through his participation in the enterprise's complex money-laundering scheme, and the use of IOSSIFOV's cryptocurrency exchange, RG Coins, the criminal enterprise evaded detection for years, ultimately defrauding countless victims out of millions of dollars. After a four-year, multi-agency investigation, a grand jury sitting in the Eastern District of Kentucky returned an Indictment charging IOSSIFOV with one count of conspiracy to commit racketeering and one count of conspiracy to commit money laundering. On September 28, 2020, after a two-week trial, a jury found IOSSIFOV guilty of both counts.

      In advance of sentencing in this matter, the United States sets forth below its position on the appropriate sentence. Balancing the seriousness of the offense and other factors in 18 U.S.C. § 3553(a), the government recommends a sentence of 144 months, within the Guidelines range. This sentence meets the objectives of 18 U.S.C. § 3553(a) in fashioning a sentence that is adequate, but not greater than necessary, as required by law.

I.   **The Applicable Advisory Guidelines Range**

The Sentencing Guidelines range serves as the "starting point and initial benchmark" for the Court's sentencing analysis. *United States v. Bolds*, 511 F.3d 568, 579-80 (6th Cir. 2007) (citation omitted). Accordingly, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines Range." *United States v. King*, 553 F. App'x 518, 520 (6th Cir. 2014) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)).

The Presentence Investigative Report ("PSR") correctly calculates IOSSIFOV's guidelines range beginning with an initial offense level of eight (8), because the Guidelines instructs that we apply the offense level applicable to the underlying racketeering activity, here, money laundering. The PSR also properly increases the offense level by eighteen (18) levels for a loss amount greater than $3,500,000 but not more than $9,500,000, and four (4) levels because IOSSIFOV was in the business of laundering funds. Because IOSSIFOV lied under oath on numerous occasions, the PSR also correctly applies a two (2)-level enhancement.

IOSSIFOV raises two objections to the PSR's calculation of the Sentencing Guidelines. IOSSIFOV first challenges the application of an enhancement for obstructing justice. He then argues that his loss amount is no more than $1.8 million.

A.   *The PSR Properly Applies an Enhancement for Obstructing Justice*

A two-point enhancement for obstruction of justice applies when the defendant "attempted to obstruct or impede the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," so long as the "conduct was related to the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. A defendant obstructs justice by "committing, suborning, or attempting to suborn perjury[.] U.S.S.G. § 3C1.1, cmt. n. 4(b).

At trial, IOSSIFOV repeatedly provided materially false statements. The PSR identifies three examples. First, IOSSIFOV lied about his use of an encrypted email service to communicate with his coconspirators. On his direct examination, IOSSIFOV was asked:

> Q. Now, did RG Coins have an email address?
>
> A. Yes.
>
> Q. And what was it?
>
> A. rgcoins67@gmail.com. And one more, office@rgcoins.com.
>
> Q. And at some point, did you have a Proton email account?
>
> A. Not the company. I, myself had one.

Attach. A at 23. As this exchange makes clear, IOSSIFOV was asked about the email accounts he used for business, and whether he used the encrypted email service, ProtonMail. He provided a list of business email accounts, but omitted the ProtonMail account he set up for his company. Considering this, on cross examination the government confirmed IOSSIFOV's statement:

> Q. I want to begin by just asking you about something that kind of confused me when you said it. Did I hear you correctly that you said you did not have a ProtonMail account for business, only for personal?
>
> A. I said that I have a personal email Proton.
>
> Q. But not for business?
>
> A. My personal email Rossen.Iossifov@Proton.net--.com has not been used for business.

*Id*. at 52. However, contrary to IOSSIFOV's testimony, IOSSIFOV operated a separate ProtonMail account in the name of his business: rgcoins@protonmail.com. *Id*. at 53. It follows that IOSSIFOV would hide this encrypted account from the jury because, as the government's exhibits proved, he shifted from using Gmail to using this encrypted account to communicate with other members of the criminal enterprise. *Id*. In other words, he shifted from a

communication method that law enforcement could review to a communication method that was encrypted, and in doing so, he sought to shield his communications from law enforcement review. Only when confronted with exhibits directly contradicting his testimony did IOSSIFOV claim that he never "said that I don't have a business account in Proton." *Id*. at 54. Yet, that is precisely what he offered on direct testimony. *Id*. at 23.

Second, IOSSIFOV also claimed at trial that he always verified the identification of his customers when they sought to exchange bitcoin. *See, e.g.*, *id*. at 31-32, 58. Yet, every trial witness that had exchanged bitcoin with IOSSIFOV testified that he never asked for identification. *See id*. at 65. Indeed, this is what made IOSSIFOV's cryptocurrency exchange an attractive and preferred outlet to launder ill-gotten gains. *See also id*. at 57 (email communications documenting refusal to provide identification).

Finally, IOSSIFOV refused to provide truthful answers pertaining to his passwords. Shortly after IOSSIFOV was arrested, someone changed the password to IOSSIFOV's account on Dropbox, an online file storage and sharing platform. It turned out that this Dropbox account contained ledgers pertaining to IOSSIFOV's criminal clients. At trial, IOSSIFOV testified that he "might have an opinion on who might have tried to change [the password], but I wouldn't say because I can't prove it." *Id*. at 69. When asked for his opinion, he refused to answer, requiring the Court to intervene and order IOSSIFOV to provide his opinion on who changed the password. *Id*. at 70. IOSSIFOV then provided a generic response that it must have been someone that possessed his passwords. *Id*. The government asked again, "Sir, you had a specific person or persons in mind; it was obvious a moment ago. I'm asking you who those persons are you believe changed the password." *Id*. IOSSIFOV refused to answer, stating instead, "I have no idea." *Id*.

4

IOSSIFOV attempts to explain away these instances of false and self-contradictory testimony by asserting an inability to speak English. However, IOSSIFOV had the benefit of certified translators, and as a result of the translation, IOSSIFOV both heard questions and responded in his native language. On direct examination, he was asked open ended questions and did not express difficulty in understanding questions or responding. To the contrary, he provided fulsome responses, as demonstrated above. He had every opportunity to provide truthful testimony. That his testimony faltered on material questions that relate to his culpability and knowledge of wrongdoing, and that it occurred on multiple occasions, shows a deliberate attempt to obstruct the administration of justice through perjury.

B. *The PSR correctly calculates a loss amount exceeding $3,500,000*

The evidence at trial showed that in the span of two years IOSSIFOV exchanged approximately $4,975,866 worth of bitcoin for just four members of the conspiracy. *See* Attach. B (Exhibit 141). This figure is noteworthy for two reasons. First, it was gathered by examining email communications with other members of the AOAF Network, which was the primary method that members of the enterprise would initiate, negotiate, and confirm transactions with IOSSIFOV. Thus, IOSSIFOV's objections pertaining to Bitcoin addresses and other Bulgarian clients is unavailing. Second, Exhibit 141 was only part of the picture. The expanded version of that same chart shows that these figures do not account for the full scope of loss. By the time IOSSIFOV had exchanged money, other members of the conspiracy, and in particular, the U.S.-based money launderers, had already taken their cut of the proceeds. Factoring this in, the loss suffered by victims for just four members of the conspiracy is $7,471,373. *See* Attach. C.[1]

---

[1] These calculations are derived from the cuts negotiated by the Confidential Source with each of these four fraudsters individually. *See*, *e.g.*, Attach. C (reflecting that, for instance, Catalin2016

5

The Defendant's other concerns with the loss amount are unpersuasive. First, all the funds counted in this loss amount figure are the funds the four co-conspirators directed to IOSSIFOV for further laundering, as supported by the email communications between IOSSIFOV and these coconspirators. The United States used the Bitfinex historical index provided on investing.com to determine the value of bitcoin on the day of the transfer. While the value of bitcoin may shift during the day, using the Bitfinex historical index is more than reasonable. *See* U.S.S.G. § 2S1.1 cmt. n. 3(C) (declaring that the "court need only make a reasonable estimate of the loss."). Indeed, in an email to another member of the AOAF Network, IOSSIFOV himself stated that he used Bitfinex to determine exchange rates. *See* Attach. D.

To be sure, the scheme is larger than IOSSIFOV, or the 19 others who were charged alongside him. However, for all of the reasons outlined above, IOSSIFOV should be held accountable for the loss occasioned by the AOAF Network that was reasonably foreseeable to him, which is greater than $3,500,000.

**IV.   A Guideline Sentence is Appropriate Under 18 U.S.C. § 3553(a)**

In achieving the demands of 18 U.S.C. § 3553(a) in fashioning a sentence, district courts consider the Sentencing Guidelines *together* with the statutory factors set forth in § 3553(a). *See United States v. Booker*, 543 U.S. 220, 246 (2005). This is because the Guidelines "reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). The Guidelines therefore "seek to embody the § 3553(a) considerations, both in principal and in

---

negotiated for domestic processors to receive 41.4% of fraud proceeds, meaning Catalin2016 retained 58.6%).

practice." *United States v. Haj-Hamed*, 549 F.3d 1020, 1027 (6th Cir. 2008) (*quoting Rita*, 552 U.S. at 350). Here, PSR properly calculates the Guidelines offense level at 32. With a criminal history category of I, the Guidelines range is 121 to 151 months. The United States seeks a sentence of 144 months, for the reasons that follow.

Pertinent § 3553(a) factors courts consider include the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, and the need to avoid unwarranted sentencing disparities between similarly situated defendants. *See* 18 U.S.C. § 3553(a)(1)-(3), (6). When forming the appropriate sentence, the Court endeavors to find a punishment that is "sufficient, but not greater than necessary" to address these considerations. 18 U.S.C. § 3553(a).

Turning first to the nature and circumstances of the offense—the conspiracy as a whole was far-reaching, complex, and sophisticated. It demonstrated a constant evolution, becoming more and more convincing to its victims, abusing victims' sympathies for the military, cloaking itself under the goodwill of legitimate businesses such as eBay, and fabricating invoices with language designed to make the victims feel secure in their purchase.

To evade detection, the conspiracy then engaged in a sophisticated money laundering scheme, relying heavily on the decentralized and anonymous nature of cryptocurrency. The money laundering scheme involved multiple layers of subterfuge to conceal fraud proceeds.

> Level 1: Romania-based defendants would defraud U.S.-based victims into sending money in exchange for what turned out to be nonexistent items, or would purchase proceeds of this fraud from other conspirators.
>
> Level 2: U.S.-based money mules would receive victim funds, either in their personal bank accounts, personal Post Office boxes, or from the Level 1 Romania based defendants' communications, who retrieved pictures of the fronts and backs of debit cards from victims.

Level 3: The funds would then be converted by U.S.-based conspirators into digital currency.

Level 4: The funds would then be transferred to the possession of conspirators in Romania.

Level 5: Money exchangers in Eastern Europe, such as IOSSIFOV, would then convert the funds to local fiat currency through crooked bitcoin exchangers who did not practice strict or effective anti-money laundering or know-your-customer protocols.

Level 6: Fiat currency would be deposited into the accounts of friends, relatives, or low-level members of the conspiracy. These account holders would withdraw the funds and ultimately remit the proceeds to the original fraudsters.

To be sure, IOSSIFOV only occupied one rung of this ladder, but he was critical to the success of the scheme. After all, what good is making all of this money if it exists in a form that cannot be used in the regular course of life? IOSSIFOV, like so many others, may have started exchanging bitcoin as an enthusiast or speculator, but the allure of money, quick and anonymous, shifted his business practices to catering to the criminal underworld of the Romanian online auction fraud industry. Hiding beneath a veneer of business legitimacy, IOSSIFOV'S conduct allowed the conspiracy's criminal acts to reach further, exploit more victims, and conceal higher volumes of proceeds. Without individuals like IOSSIFOV to convert ill-gotten bitcoin into clean fiat currency, the enterprise would not be able to realize the ultimate goals of the conspiracy—to enjoy the spoils of fraud and evade detection. A Guidelines sentence reflects the comprehensive and complete exploitation of the conspiracy's victims.

As to the history and characteristics of the defendant, the evidence at trial revealed that IOSSIFOV knew well the practices and customs in place to ensure that exchangers such as himself would not unwittingly exchange the proceeds of fraud, and he professed to engage in such policies. *See*, *e.g.*, Attach. E (Exhibit 108, documenting IOSSIFOV's anti-money laundering practices). As reflected by the jury verdict, IOSSIFOV did not engage in such

practices, instead opting to create a business model designed to attract criminal clients. If that was not enough to demonstrate IOSSIFOV's disrespect for the law, the Court need look only at his willingness to obstruct the administration of justice, as described above.

A Guidelines sentence will also reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and protect the public. Cybercrime is not a victimless crime simply because it is committed from behind a keyboard. Rather, as this case makes clear, the extensive reach of the internet makes cybercrime much more widespread than traditional fraud schemes. And as a result of new technology, the barriers to entry for new cybercriminals have become extraordinarily low. With an internet connection and a working knowledge of English, even unsophisticated would-be criminals anywhere in the world can now perpetrate fraud on numerous U.S. victims, or launder the proceeds of such fraud.

Deterrence is an important consideration, specific to this Defendant and generally to all would-be cybercriminals and third-party money launderers. As to this Defendant, the previous paragraphs detail his willingness to violate the law in favor of his own financial gain. A Guidelines sentence would serve as an important tool of deterrence for IOSSIFOV.

A Guidelines sentence would also deter similarly situated cryptocurrency exchangers who willfully turn a blind eye to proceeds of online crime. Cryptocurrency exchangers that knowingly mold their business practices into a tool for unlocking riches for the online criminal world are rarely brought to justice. Many cybercriminals, including members of the instant conspiracy, falsely believe their conduct will remain unchecked, as they hide beneath false claims of professional legitimacy. It is the anonymity of cryptocurrencies, along with the intentional separation of the illegal monetary conduct from the underlying fraud, that have encouraged a vast upsurge in the availability of online third-party money launderers, who

9

facilitate devastating financial damage upon untold victims located anywhere in the United States and elsewhere, all from the comforts of sitting at a computer. Third-party money launderers engage in this conduct, in part, because they believe it is doubtful that they will be caught and brought to justice. In cases where detection and apprehension occurs, the sentence must be commensurate to the increased need for deterrence.

IOSSIFOV's total disregard for the impact of his business on U.S. based victims is summed up in this statement from his testimony: "I can't say to [the victims] I'm really sorry because I really do not feel associated with this fraud." Attach. A at pp. 50 ln. 21-23. IOSSIFOV therefore poses a specific and ongoing threat to the public. The victims' own words reflect the weight of the crime, as the testimony of Kathy Calderon, Jesus Frutos, Yvette Coles, and Jeff Burnham demonstrated at trial. A student, truck driver/owner of trucking company, pastor, and computer engineer, all duped into spending money for a vehicle that did not exist, a theft that stole from them much more than just money.

The humiliation, torment, and loss of faith these four victims testified about were shared by many of the conspiracy's victims. Ma.D. stated, "I felt like a fool and had a severe bout of depression[.]" D.S., who was buying a motorhome for his honeymoon, stated that he and his new wife "lost a lot of faith in the human race after that." D.G.R., who had only $4,500 to his name, attempted to buy a vehicle so he could drive to work and take his children to school. He said, "It was one of the wors[t] feelings to be robbed for all you have and there's nothing I could've done about it. It took me 16 months to save for another car and the stress, anxiety, and sadness was tremendous throughout." Another victim, Me.D., was four-months pregnant when she attempted to purchase a low-impact exercise machine for her father who suffered from cancer and painful orthopedic issues.

> Foolish. Humiliated. Embarrassed. Angry. Those 4 words best describe how I felt after realizing I was the victim of an online scam. I also couldn't afford to purchase another exercise machine for my Dad. So I could add 'guilt-ridden' as a fifth word. The loss of the money was not insignificant but the deeper marks were the lost opportunity to help my Dad improve his health and thoughts about what kind of world my child was going to be born into.

Far from being victimless, the fraud perpetrated by this conspiracy and supported through money laundering efforts of individuals like IOSSIFOV cause significant harm to victims and long-lasting incidental harm to their loved ones.

Finally, as this Court is aware, the Superseding Indictment charges twenty defendants, with multiple defendants having already been sentenced. The Guidelines provide the most consistent way to ensure that the sentences for these defendants, with varying levels of participation, are sentenced without unwarranted disparities.

### V.  Conclusion

The United States submits that the offense level is correctly calculated in the PSR, and that this Court should sentence ROSSEN IOSSIFOV to 144 months imprisonment.

Respectfully submitted,
ROBERT M. DUNCAN, JR.
UNITED STATES ATTORNEY

By:   /s/ Kathryn M. Anderson
      Kathryn M. Anderson
      Assistant United States Attorney
      260 W. Vine Street, Suite 300
      Lexington, Kentucky 40507-1612
      (859) 685-4885
      Kathryn.Anderson@usdoj.gov

      Kenneth R. Taylor
      Assistant United States Attorney
      260 W. Vine Street, Suite 300 Lexington,
      Kentucky 40507-1612
      Ken.Taylor@usdoj.gov
      (859)685-4874

Frank Lin
Senior Counsel
Computer Crime and Intellectual Property Section
1301 New York Avenue NW, Suite 600
Washington, DC 20530
Frank.Lin@usdoj.gov
(202)305-9266

Timothy C. Flowers
Senior Trial Attorney
Computer Crime and Intellectual Property Section
1301 New York Avenue NW, Suite 600
Washington, DC 20530
Timothy.Flowers2@usdoj.gov
(202)353-0684

CERTIFICATE OF SERVICE

On January 4, 2021, I electronically filed this document through the ECF system, which will send the notice of electronic filing to counsel of record:

> John Kevin West
> *Attorney for Rossen Iossifov*

s/ Kathryn M. Anderson<br>Assistant United States Attorney