UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 5:18-CR-81-REW-MAS-15 |
| | ) | |
| v. | ) | |
| | ) | OPINION & ORDER |
| ROSSEN IOSSIFOV, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

I. **Background**

In January 2021, the Court sentenced Defendant Rossen Iossifov to a 121-month term of imprisonment for conspiracy to commit a RICO offense and conspiracy to commit money laundering. *See* DE 1055 (Judgment). The Sixth Circuit affirmed the judgment. *See United States v. Iossifov*, 45 F.4th 899 (6th Cir. 2022). After serving nearly three years of his sentence, Iossifov, now an inmate at FCI Fort Dix, filed a *pro se* motion seeking both compassionate release under 18 U.S.C. § 3582 and a sentence reduction under Amendment 821 of the Sentencing Guidelines. *See* DE 1551 (Motion). The Court eventually granted the latter portion of this motion in May 2024 and reduced Iossifov's sentence to 111 months. *See* DE 1602 (Reduction Order). The compassionate release aspect of DE 1551, however, has taken a longer-winding road.

As amended by the First Step Act of 2018 (FSA),[1] § 3582 requires an inmate seeking compassionate release either to "fully exhaust[] all administrative rights to appeal" through the Federal Bureau of Prisons (BOP) or to wait "30 days from the receipt of such a request by the warden" before filing a motion with the Court. 18 U.S.C. § 3582(c)(1)(A). Iossifov first filed his

---

[1] Pub. L. No. 115-391, 132 Stat. 5194 (2018).

motion for compassionate release on November 20, 2023. *See* DE 1551. The Government opposed that motion, citing Iossifov's failure to exhaust his administrative remedies prior to seeking court intervention. *See* DE 1556. The Court agreed with the Government and denied the motion without prejudice, pending proper exhaustion. *See* DE 1557. In April 2024, Iossifov moved to re-submit his § 3582 challenge, contending that he had now properly satisfied the exhaustion requirement. *See* DE 1599. The Government once again argued failure to exhaust. *See* DE 1604. This time, however, the Court found that Iossifov exhausted his administrative remedies and accordingly ordered the Government to respond to the merits of Iossifov's motion. *See* DE 1605. The Government complied, *see* DE 1608, and Iossifov replied, *see* DE 1618.[2] The matter is now ripe for review.

II.     **Legal Standard**

Generally, a "court may not modify a term of imprisonment once it has been imposed[,]" unless one of Congress's prescribed exceptions says otherwise. *See* 18 U.S.C. § 3582(c). Relevant here, a court may, on proper motion, "reduce [a] term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable" if the Court finds that "extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]" *Id.* § 3582(c)(1)(A). By separate statute, Congress in 1984 directed the United States Sentencing Commission to define "extraordinary and compelling reasons for sentence reduction[.]" 28 U.S.C. § 994(t); *see id.* § 994(a)(2)(C) (directing promulgation of "policy statements regarding . . . the appropriate use of . . . the sentence modification provisions set forth in section[] . . . 3582(c) of

---

[2] Iossifov styled DE 1618 as a "Motion for a Modification of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)[.]" The Court, given the context, the content, and the previous ruling in DE 1602, construes this document as a reply to the Government's response at DE 1608, as opposed to a new motion.

title 18"). The Sentencing Commission initially fulfilled Congress's directive in 2006, explaining that a court may reduce a term of imprisonment if (1) "extraordinary and compelling reasons warrant the reduction[,]" (2) "the defendant is not a danger to the safety of any other person or to the community," and (3) "the reduction is consistent with this policy statement." U.S. Sent'g Guidelines Manual [USSG] § 1B1.13(1)–(3) (2006); *see also United States v. Jones*, 980 F.3d 1098, 1104–06 (6th Cir. 2020). Over the next twelve years, the Commission left that policy statement unchanged while building out a list of enumerated "extraordinary and compelling" circumstances that may warrant reduction or release. *See Jones*, 980 F.3d at 1104.

Prior to 2018, § 3582(c) allowed only the BOP to move for an inmate's compassionate release. *See id.* at 1105–06. That changed, however, with the passage of the FSA, which enabled prisoners to circumvent the BOP and petition courts directly for compassionate release after properly exhausting administrative remedies. *See* Pub. L. No. 115-391, 132 Stat. 5194 (2018); *see also Jones*, 980 F.3d at 1104–05. Accordingly, the Sixth Circuit established a "three-step inquiry" for prisoner-initiated compassionate release requests,[3] directing the Court to determine whether (1) "extraordinary and compelling reasons" warrant a sentence reduction, (2) "such a reduction [would be] consistent with applicable policy statements issued by the Sentencing Commission," and (3) release would be appropriate in light of the applicable § 3553(a) sentencing factors. *See Jones*, 980 F.3d at 1101. In any § 3582 action, the defendant, as the movant, bears the burden of establishing eligibility for a reduction in sentence. *See United States v. Sherwood*, 986 F.3d 951, 954 (6th Cir. 2021) ("[Defendant] must make a compelling case as to why the sentencing court's

---

[3] The Court may deny a compassionate release motion "based on the defendant's failure to meet any one of [the] criteria." *United States v. Tomes*, 990 F.3d 500, 502 (6th Cir. 2021). Granting release, however, requires a positive finding at each step. *See United States v. Navarro*, 986 F.3d 668, 670 (6th Cir. 2021) (noting that "where the district court grants a motion for compassionate release, it must of course address all three steps").

§ 3553(a) analysis would be different if conducted today." (citing *Navarro*, 986 F.3d at 671–72)); *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013).

While § 1B1.13 previously only applied to BOP-initiated requests for compassionate release, *see Jones* 980 F.3d at 1109–10, the Sentencing Commission recently amended the policy statement to also govern motions filed by defendants, *see* USSG § 1B1.13(a) (2023). Tracking the language of the 2006 version of the statement, § 1B1.13 provides that the Court may only grant compassionate release if "extraordinary and compelling reasons warrant the reduction; . . . the defendant is not a danger to the safety of any other person or to the community . . . ; and the reduction is consistent with this policy statement." *Id.* As it stands today, § 1B1.13's provisions list six potential "extraordinary and compelling" situations: (1) medical conditions, (2) age, (3) family circumstances, (4) status as a victim of abuse, (5) other comparable/cumulative reasons, and/or (6) an unusually long sentence. *See id.* § 1B1.13(b)(1)–(6) (2024).

### III. Analysis

#### a. Extraordinary and Compelling Reasons

Iossifov presents four broad reasons why his circumstances are "extraordinary and compelling" under § 1B1.13: (1) his medical conditions; (2) his family circumstances; (3) his language barrier in prison (and miscellaneous prison conditions); and (4) his lack of a supervised release term. *See* DE 1551 at 3–4. The Court takes each in turn.

##### 1. Medical Conditions

Iossifov first contends that he is entitled to compassionate release due to the following string of alleged medical conditions:

- BMI > 30
- Former 2 pack a day smoker
- High Blood Pressure, in which two different medications are given (Lysinoprol and Meloprolol)

4

- Torn meniscus in his Right knee (Excruciating pain everyday having to walk on the longest compound in the BOP)
- Pre Diabetes
- 10 broken teeth which causes serious pain and has not been addressed
- Rheumetoid Arthritis
- Siusitus
- Gastritis
- Pinched nerve in lower back[.]

*Id.* at 3 (as spelled in original).  Iossifov primarily argues that these conditions, in conjunction with the risk created by COVID-19, combine to satisfy the criteria set out by USSG § 1B1.13(b)(1)(D), which puts forth three requirements for extraordinary and compelling medical conditions:

(i) the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

(ii) due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

(iii) such risk cannot be adequately mitigated in a timely manner.

USSG § 1B1.13(b)(1)(D) (2023).[4]

Iossifov posits that "[t]he Department of Justice has taken the position in litigation that . . . an inmate[] diagnosed with a medical condition that the CDC has identified as a serious risk factor for COVID-19, and from which the serious risk factors the inmate is not expected to recover, presents an 'extraordinary and compelling reason' that may warrant compassionate release." DE 1551 at 7–8 (emphasis omitted) (citation omitted).  He also criticizes Fort Dix's facility-wide COVID-19 response, alleging that "inmates are not being tested for COVID-19 unless they are days within release to the community" and that "several prisoners in [Iossifov's unit] at FCI Fort

---

[4] And (C) applies for a defendant suffering a medical condition requiring long-term or specialized care not being provided, creating risk of serious health deterioration or death.

Dix recently contracted COVID-19[,] . . . [but p]rison staff refused, pursuant to prison policy, to test the vaccinated or unvaccinated prisoners in Petitioner's Unit despite having confirmation that those prisoners were allowed to potentially spread the virus." *Id.* at 14–15.

Iossifov's arguments, however, fall short. First, he fails to make an adequate showing that FCI Fort Dix is currently affected by an ongoing outbreak or public health emergency. At present, no relevant authority has declared an ongoing health emergency at Fort Dix, and BOP statistics show that as of October 9, 2024, there was only one active COVID-19 case among the facility's 3,781 inmates (2,484 of whom are fully vaccinated). *See Inmate COVID-19 Data*, BOP, https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp (last updated Oct. 9, 2024). Iossifov makes no argument that he is this one positive, and these statistics do not show an "ongoing outbreak" of COVID-19 at Fort Dix.

Further, Iossifov fails to show that COVID-19 puts him at risk of severe medical complications that cannot be adequately mitigated in a timely manner. The Sixth Circuit has made clear that "in view of the availability of effective COVID-19 vaccines, a defendant's imprisonment during the pandemic no longer presents an extraordinary and compelling reason for compassionate release—even if he has serious medical conditions." *United States v. Brown*, No. 22-3384, 2023 WL 11116326, at *2 (6th Cir. Nov. 17, 2023). Thus, inmates with access to the COVID-19 vaccine generally do not present an "extraordinary and compelling reason warranting a sentence reduction" because they "largely face[] the same risk from COVID-19 as those who are not incarcerated." *United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021) (internal quotations omitted).

Here, BOP records indicate that Iossifov was offered the COVID-19 vaccine in April 2022 but refused it. *See* DE 1608-3 at 111 (Medical Summary). Iossifov does not explain why he refused the vaccine or claim that he cannot get the vaccine now. A defendant's unexplained refusal

6

to receive an available vaccine defeats his compassionate release claim, regardless of the seriousness of his medical conditions. *See Lemons*, 15 F.4th at 751 ("We need not debate the medical implications of [defendant's] condition. For even recognizing the purported seriousness of his condition, the fact remains that . . . the COVID-19 vaccine is available to him in prison. . . . [I]f an inmate does not present a compelling reason justifying the failure to be vaccinated despite access to the vaccine, a district court would abuse its discretion by granting a motion seeking a sentence reduction under § 3582(c) . . . on the grounds that COVID-19 constitutes an extraordinary and compelling justification."); *United States v. Pittman*, No. 23-1035, 2023 WL 9231493, at *2 (6th Cir. Dec. 4, 2023) ("Although [defendant] argues that [he is] unusually susceptible to contracting and suffering severe complications from COVID-19, he does not provide any reason why he cannot get a COVID-19 vaccine, and the availability of safe and effective vaccines all but eliminates COVID-19 as a reason for compassionate release."). Thus, Iossifov's unexplained refusal to vaccinate himself further dooms his COVID-19 argument.

Setting COVID-19 considerations aside, Iossifov's medical conditions on their own do not present extraordinary and compelling circumstances. Notably, Iossifov has the burden, and he tendered no competent proof on any of the factual assertions in his filing. However, the Government secured and provided a large cache of records. The Court notes that the record does not support Iossifov's claim of a BMI greater than 30 (*i.e.* the number needed to meet the CDC's definition of "obese"). At a January 29, 2024 clinical checkup, Iossifov was measured at 6'0 and 205.0 pounds. *See* DE 1608-5 at 1 (Clinical Encounter). According to the CDC, this equates to a BMI of 27.8, which falls within the category of "overweight" instead of "obese." *See Adult BMI Calculator*, CDC, https://www.cdc.gov/bmi/adult-calculator/index.html (last visited Nov. 26,

7

2024).[5] Thus, the Court will not consider Iossifov's alleged obesity as a relevant condition. And it seems from the chronology that Iossifov was larger at sentencing, cutting sharply against a risk-based change.

As to the rest of Iossifov's purported medical conditions, prison records show that he has received access to all necessary treatment throughout his confinement. *See United States v. Mathews*, 846 F. App'x 362, 369 (6th Cir. 2021) (finding district courts should consider treatment available to incarcerated persons with medical conditions). To start, staff have treated Iossifov's high blood pressure with consistent monitoring, attention, and medication. *See, e.g.*, DE 1608-3 at 21 (clinic checkup addressing Iossifov's hypertension); *id.* at 33 (Aprill 2022 summary showing Iossifov's Lisinopril and Metoprolol prescriptions, taken to treat hypertension); DE 1608-5 at 13 (showing both prescriptions still active as of June 2024).

Likewise, Iossifov's alleged meniscus tear and corresponding arthritis have both been adequately addressed and treated. The BOP was aware that Iossifov had "right knee [meniscus] surgery in 2012," *see* DE 1608-3 at 14, and as a result, conducted a scan of both Iossifov's knees in August 2022, *see id.* at 100–01 (Knee Exam Results). The scan found "[n]ormal alignment of both knees without acute bony abnormalities or joint effusions," and specifically within the right knee, found only "minimal [to] mild medical compartment osteoarthritis [and m]inimal osteoarthritis within the lateral component." *Id.* at 5. The BOP prescribed Iossifov Meloxicam to treat this osteoarthritis (the only issue identified in the scans), *see* DE 1608-3 at 6, and has continued to monitor both Iossifov's prescription and the condition of his knees.

As to his broken teeth (which Iossifov claims have gone "unaddressed"), records show that Iossifov has received consistent dental treatment, including the extraction of three teeth. *See* DE

---

[5] Even at Iossifov's heaviest recorded prison weight of 210.0 pounds, *see* DE 1608-3 at 9, his BMI would still only be 28.5.

8

1608-3 at 88; DE 1608-4 at 34. In fact, at a previous appointment, it was Iossifov himself who initially stated that he "did not want to extract" a tooth that was found to be "falling apart." DE 1608-4 at 28. Iossifov also no-showed multiple dental appointments within the last two years. *See* DE 1608-4 at 27; DE 1608-5 at 14.

Next, medical staff addressed Iossifov's alleged pinched nerve by conducting X-rays of his back and spine in July 2023. *See* DE 1608-4 at 47–49. Iossifov has not pursued any follow-up treatment related to a pinched nerve in the time since, nor has he provided further explanation of this condition. Likewise, medical records show awareness and monitoring pertinent to Iossifov's former smoking. *See, e.g.*, DE 1608-3 at 41. Finally, Iossifov's records make no mention of any history or diagnosis of rheumatoid arthritis, sinusitis, gastritis, or pre-diabetes. Even assuming the presence of these conditions, however, Iossifov does not articulate why available BOP healthcare coverage—which he has utilized frequently throughout his prison sentence—cannot adequately address these ailments.

Iossifov attempts to demonstrate FCI Fort Dix's subpar medical care by referencing three other cases in which courts granted compassionate release to Fort Dix inmates. *See* DE 1551 at 13. However, the defendants in those cases all demonstrated two things that Iossifov has not: (1) at least one way in which Fort Dix clearly failed to provide timely and necessary medical care, and (2) serious, life-threatening medical conditions that were either worsened or outright caused by this failure to provide care. *See United States v. Burr*, No. 1:15-cr-362, 2022 WL 17357233, at *2–3 (M.D.N.C. Dec. 1, 2022) (ongoing medical conditions included heart failure, gallbladder removal, and abdominal pain that required three ER trips and, eventually, an endoscopy that Fort Dix failed to schedule for over a year); *United States v. Roman*, No. 2:14-cr-43, 2021 WL 3173351, at *4 (S.D. Ohio July 26, 2021) (granting release due to inmate's blindness resulting from Fort

9

Dix's failure to properly treat glaucoma); *United States v. Derentz*, 608 F. Supp. 3d 189, 193–95 (E.D. Pa. 2022) (granting release for 70-year-old inmate who lost vision in left eye after Fort Dix failed to schedule timely surgery). Every case has unique variables, but Iossifov's complaints, condition, and treatment history do not compare to these cases.

Here, Iossifov's proffered medical ailments, even if taken fully at face value, do not rise to the level of the conditions faced by the inmates in these three cases. Moreover, Iossifov's records demonstrate that the BOP has provided him with adequate, timely medical care throughout his time in incarceration, and there is no proof on which to question care continuity: The warden at Fort Dix found that Iossifov is "able to perform instrumental activities of daily living (IADL) and activities of daily living (ADL) independently" and that his "medical conditions are stable." *See* DE 1599-1 at 3 (Warden Response). Iossifov has not been placed under any work restrictions during his confinement. *See, e.g.*, DE 1608-3 at 69 (no restrictions as of May 2022); DE 1608-4 at 20 (same Nov. 2023); DE 1608-5 at 12 (same Apr. 2024). And recent checkups have found that Iossifov's cardiovascular, pulmonary, GI, neurological, and autonomic system assessments were all within normal limits. *See, e.g.*, DE 1608-4 at 4–5; *see also* DE 1599-1 at 3 (labeling Iossifov as "Medical Care Level 2–Stable Chronic Care"). In short, Iossifov has provided no basis to show that his medical conditions, on their own, are in any manner extraordinary and compelling such as would justify sentence reduction.

Finally, Iossifov dedicates substantial discussion to generalized criticisms of the conditions at Fort Dix. *See id.* at 16–18 (alleging water contamination and toxic mold). However, Iossifov, who offers only references to outside litigation, but no proof, fails to show how these broad facility-wide complaints connect to his *own* particularized medical circumstances, so as to justify his *own* release. Based on the record before it, the Court comprehends no reason to conclude that Fort Dix

10

failed to provide Iossifov with adequate medical care, or that it will not continue providing such care going forward.

Iossifov has failed to establish that extraordinary and compelling medical conditions render him eligible for reduction. The Guidelines provide the framework; Iossifov has not met the (b)(1)(C), (b)(1)(D), or residual formulations. His conditions seem fairly typical for a man in America in his 60s. The BOP is treating him effectively, and Iossifov has long had access to COVID vaccination and any care warranted for his particular medical profile. A sentence reduction, for medical reasons, is not applicable because no extraordinary and compelling basis exists.

### 2. Family Circumstances

Iossifov next points to his family circumstances, stating that he has gone "5 years [without] seeing his children" and that his "Father passed away while [Iossifov was] in prison." DE 1551 at 4. He also makes one reference to his "family['s] financial distress." *Id.* at 11. Outside these brief statements, Iossifov provides no additional explanation to support this basis for release. The Sentencing Guidelines provide the following examples of extraordinary and compelling family circumstances:

    (A)    The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a mental condition.

    (B)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

    (C)    The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.

    (D)    The defendant establishes circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family member or an individual whose relationship with the defendant is

11

> similar in kind to that of an immediate family member, when the defendant would be the only available caregiver for such family member or individual.

USSG § 1B1.13(b)(3).

None of these scenarios—which all depend in some form on the complete absence of an alternate caregiver for a close family member—applies here. Iossifov's children were 29 and 30 years old at the time of sentencing. *See* DE 1058 ¶ 45 (PIR). Iossifov does not argue that either of these fully grown adults requires a caregiver. And as to the passing of his father, while the Court sympathizes with Iossifov's loss, this clearly does not invoke one of § 1B1.13(b)(3)'s enumerated examples. The same is true of his family's purported "financial distress," a claim that Iossifov provides no elaboration for. Family separation and privation are unfortunate costs of crime. Far from being extraordinary, such losses represent an aspect of incarceration. Thus, Iossifov's familial circumstances are not extraordinary or compelling for purposes of compassionate release.

### 3. Language Barrier

Iossifov—who is Bulgarian and does not speak English or Spanish—next argues that the language barrier he faces in prison justifies early release because "he cannot take [the Residential Drug Abuse Program (RDAP)] in which he would get an additional year off" and because "it is impossible for Petitioner to explain his maladies to medical staff." DE 1551 at 3.

First, it does not appear that the language barrier has meaningfully affected Iossifov's ability to communicate with medical staff, as records show frequent use of translation services and otherwise present no indication of communication difficulties. *See, e.g.*, DE 1608-3 at 81 ("[Patient] used translation service"); DE 1608-4 at 1 (spoke "[v]ia translator"); DE 1608-3 at 11 (same); DE 1608-4 at 4 ("phone interpreter was used"); DE 1608-3 at 85 ("Discussed and read [information] . . . using google Bulgarian translation"); *id.* at 99 ("translation serviced used").

12

As to RDAP, by Iossifov's own admission, he has no history of substance abuse, and the Court did not recommend any treatment programming at the time of sentencing. *See* DE 1062 at 6 (SOR) (noting Iossifov has "no history of substance abuse" and finding that "[t]he record reveals no evident treatment needs"); DE 1058 ¶ 49 ("[Iossifov] denied any substance abuse history [and] . . . noted no history of substance abuse treatment."). Iossifov further makes no argument that a need for RDAP programming has arisen during his period of incarceration. Thus, even if Iossifov spoke English or Spanish, he would not be a realistic RDAP candidate. In short, Iossifov seeks credit for inability to complete a program for which he has no need. This the Court will not entertain or grant. *See, e.g.*, *United States v. Pierce*, 2023 WL 131124, at *4 (D.S.C. Jan. 9, 2023) (declining to grant compassionate release because "[n]o agreement existed between the court, government, and Defendant at sentencing that reflects the parties' 'collective intent' for Defendant to be eligible for early release credit after successfully completing the RDAP program").

As an additional confirmatory point, the Court notes that it explicitly considered Iossifov's language barrier as a mitigating factor at sentencing. *See* DE 1062 at 6 ("With respect to mitigating factors, Iossifov . . . has spent nearly two years in cultural and linguistic isolation, housed in a county detention facility. This was surely harder pre-sentence time than is typical."). Thus, the Court accounted for Iossifov's language barrier when it crafted the sentence, and Iossifov's arguments here provide no reason for the Court to deviate from this initial calculation. And of course, Iossifov has found a way to file dozens of pages of pro se legal filings, in English, which strongly shows that he can find a way to communicate when he requires or elects.

### 4. Supervised Release Term

Finally, Iossifov disputes the Court's decision to forgo a term of supervised release as part of the sentence, thereby making him ineligible for early release programs. Under the FSA, certain

prisoners may earn time credits by participating in "recidivism reduction programs." *See* 18 U.S.C. § 3632(d)(4)(C). Prisoners may then apply those credits "toward time in prerelease custody or supervised release." *Id.* The Director of the BOP is authorized to transfer applicable prisoners to a term of supervised release up to 12 months prior to the prisoner's projected release date. *See id.* § 3624(g)(3). However, this can *only* be done if the prisoner's sentence includes a term of supervised release. *See id.* (allowing BOP to initiate an early transfer only "[i]f the sentencing court included as part of the prisoner's sentence a requirement that the prisoner be placed on a term of supervised release after imprisonment"); 28 C.F.R. § 523.44(d)(2) ("The [BOP] may apply FSA Time Credits toward early transfer to supervised release under 18 U.S.C. section 3624(g) *only* when an eligible inmate has . . . a term of supervised release after imprisonment included as part of his or her sentence as imposed by the sentencing court." (emphasis added)). Furthermore, any prisoner who is "the subject of a final order of removal under any provision of the immigration laws" is "ineligible to apply time credits." *Id.* § 3632(d)(4)(E)(i).

Here, Iossifov claims that he has "accumulated a great amount of FSA time credits," and that if he "had originally been sentenced to a term of supervised release[,]" he would be able to apply those credits "toward his early release to supervised release (assuming of course, he meets other program eligibility criteria)." DE 1618 at 3. However, these credits will now go for naught, he argues, because he "did not receive a term of supervised release in light of his status as a deportable alien." *Id.* Although he admits that he "has a potential 'ICE' detainer," Iossifov stresses that "he is not subject to a final order of removal." *Id.* (emphasis omitted). He therefore requests the Court to use its "inherent discretion to modify the petitioner's sentence by 'adding' one month to his term of imprisonment and a 'one year' supervised release term." *Id.* at 2.

A few district courts have accepted such arguments. For example, in *United States v.*

14

*Oprea*, No. 11-cr-64, 2023 WL 6958690 (D.N.H. Oct. 20, 2023), the court addressed a nearly identical request from a Romanian prisoner and ultimately granted the supervised release term:

> Resentencing [Oprea] to serve an *additional* period of supervised release will simply make him *eligible* to participate in the BOP-administered program that affords a limited number of qualifying inmates early release to supervision; it will not guarantee Oprea's early release. Only if Oprea meets all of the program's eligibility requirements—as determined by the BOP—will he be afforded early release. Indeed, for Oprea to qualify for early release to supervised release, the BOP must, among other things, determine that he poses "a minimum or low risk to recidivate pursuant to the last reassessment of the prisoner." 18 U.S.C. § 3624(g)(1)(D)(ii). Inmates who pose a potential danger to the community—that is, those more likely to recidivate—are not eligible to apply earned FSA time credits toward early release. *See* 18 U.S.C. § 3624(g)(1)(D)(i)[–](ii). And, of course, if released to supervision, Oprea is likely to be deported.
> . . .
> Viewing the totality of the circumstances presented by Oprea's petition, the court finds that there are "extraordinary and compelling reasons" that warrant the modification of his sentence so that it includes a term of supervised release. *See* 18 U.S.C. § 3582(c). Indeed, but for Oprea's likely deportation, the court would have originally sentenced him to a significant period of supervision. Absent such relief, the goals of the First Step Act cannot be fully realized. Moreover, nothing in the record counsels against affording Oprea the opportunity to be *considered* by the BOP for early release under First Step Act.

*Id.* at *3–4; *see also United States v. Nunez-Hernandez*, No. 14-cr-20-8, 2023 WL 3166466 (D. Minn. Apr. 27, 2023) (granting similar relief).

However, other district courts have refused to add a supervised release term in similar circumstances, as seen in *United States v. Dikshit*, No. 21-cr-760, 2023 WL 8827544 (S.D.N.Y. Dec. 21, 2023):

> This court has no intention of imposing a term of supervised release on Dikshit so that he can get good time credits and get out of jail earlier. [The court] quite deliberately did not impose a term of supervised release on Dikshit. Knowing that Dikshit would not be able to get out of jail prior to the expiration of his sentenced term of incarceration explains why he got a jail sentence of just two years, not the longer jail sentence that he richly deserved. Dikshit has not demonstrated any extraordinary or compelling circumstance that is the touchstone of a motion for compassionate release[.] . . . I absolutely decline to exercise any power I might otherwise have to shorten Dikshit's sentence of incarceration . . . . Mr. Dikshit should serve his full two years—after which, I trust, he will be deported. And, in

15

> the unlikely event that Dikshit is not deported immediately after serving his sentence (and the court continues to believe that he will be deported), he will have the good fortune not to be burdened with complying the strictures of supervised release. He should be grateful for small favors.

*Id.* at *2 (internal citations omitted) (footnote omitted); *see also United States v. Bevz*, No. 21-cr-618, 2023 WL 8936323, at *1 (S.D.N.Y. Dec. 27, 2023) ("Although Bevz is not yet subject to a final order of removal, he correctly acknowledges that his deportation is 'inevitable.' Indeed, this Court sentenced Bevz on the express understanding that he would be 'deported immediately' following his release from prison. Therefore, Bevz's ineligibility for early release does not constitute an extraordinary and compelling reason for modifying his sentence." (internal citations omitted)).

Here, the Court firmly falls on the side of this latter line of cases. The Court was deliberate at the time of Iossifov's sentencing in declining to include a term of supervised release. It based this decision on the advice of the Sentencing Guidelines, which state that "[t]he court ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment." USSG § 5D1.1(c). At sentencing, the Court further explained that it was "following the recommendation in § 5D1.1(c), [which] elected against a supervision term. Iossifov will be deported following service of the sentence; his return to the U.S. is highly unlikely. The Court perceives no deterrent value in a supervision term." DE 1062 at 6. Although he may not yet be subject to a final order of removal, like in *Bevz*, the Court here sentenced Iossifov on the express understanding that he would be deported following service of his sentence. Iossifov himself readily admits that he "is the subject of an immigration detainer," *see* DE 1551 at 20, and further states in his proposed Release Plan that he intends to return to Bulgaria upon completion of his sentence. *See id.* at 18.

16

The Court rejects the request. What Iossifov really seeks is post-hoc manipulation of his sentence to create a pathway to earlier release. The Court has no appetite and sees no authority for modifying his sentence in this way, effectively adding nominal carceral time but then affixing an inapplicable SR term just to facilitate a different ultimate result. That is not what § 3582 allows or envisions. The Court sentenced with plain intent not to impose supervised release. This tracked the guidelines and was a result fully ordinary and not compelling. How that decision ripples in the BOP apparatus is not pertinent, because supervised release is a judgment aspect assigned at the time of sentencing. The decision was informed, well grounded, and quite apt for a Bulgarian assuredly on a fast ship home, for good one hopes, when incarceration ends. If the Court thought Iossifov should get an earlier release, it would grant a reduction. The Court does not think that, and it will not endorse sentencing component shell games to reach Iossifov's coveted result.

### b.  § 3553(a) Factors

Because Iossifov failed to show any "extraordinary and compelling" circumstances, the Court need not proceed to steps two and three of the § 3582(c) analysis. *See Navarro*, 986 F.3d at 670. Nonetheless, the Court notes briefly that, had it reached the issue, § 3553(a)'s sentencing factors, in the Court's view, would foreclose Iossifov's requested relief. The Court carefully considered the § 3553(a) purposes and factors in fashioning Iossifov's sentence. *See generally* DE 1062. The sentencing hearing and SOR well chronicle the Court's calculus. Iossifov has done some time, but the views and values expressed on sentencing, and except as tweaked in DE 1602 (the Amendment 821 Order) remain vital and salient.

As recorded in the SOR, Iossifov played an impactful and enduring role in an international RICO fraud scheme that, over years, targeted and victimized hundreds of persons in the United States, costing them millions of dollars. *See id.* Deterrence was a key sentence driver given the

17

need to promote respect for U.S. law by anyone so affecting this nation's jurisdiction, and to discourage persons from engaging in elusive electronic crimes under the cloak of anonymity afforded by the internet and digital currency. *See id.* Particularly troubling was Iossifov's lack of remorse for his role in the conspiracy and his deceptiveness with the Court and law enforcement. Iossifov, motivated by greed, fomented the fraudsters by flexibly offering his laundering services over a lengthy period. He looked to the fraud for over 70% of his business during a documented period. He employed anonymizing money practices (no ID, encrypted email, low documentation). During the trial, he, demonstrative of his respect-for-law deficit, lied on the stand. Iossifov's behavior bilked hundreds and hundreds of victims. Yet, to date, he has still not taken any level of responsibility, or shown an ounce of remorse, for his actions.

With this in mind, the Court rejected a downward variance from the bottom of the Guidelines range and designed Iossifov's sentence to, among other things, reflect the gravity of the crime, promote respect for law, provide just punishment, and deter future criminal conduct. *See* DE 1062 at 6. The Court also considered these same factors again when it reduced Iossifov's sentence pursuant to Amendment 821 of the Sentencing Guidelines. *See* DE 1602 at 2 (considering "any applicable § 3553(a) factors" in determining whether a reduction was warranted). At both turns, the Court assessed the full record, the details of Iossifov's crimes, his mitigating factors, and imposed the parsimonious result in accordance with § 3553(a) and governing law. That result reflected all sentencing factors and purposes in the context of Iossifov's offense and his individual circumstances. The same balance of factors here counsels against any reduction. To grant such relief would unjustly enervate the § 3553 analysis the Court carefully performed. Iossifov was the cash-out point and terminal money launderer for the foundational conspirators. He profited richly from defrauded Americans. For the callous and greedy acts, he has taken no responsibility and

shown no remorse. The crimes called for and yet call for a stout and certain sentence. The Court rejects, under § 3553 values, Iossifov's case for reduction.[6]

### IV.     Conclusion

For the stated reasons, the Court **DENIES** DE 1551 and DE 1618, **GRANTS** 1599 (to the extent it seeks a ruling on the merits), and rejects Iossifov's request for sentence reduction.

This the 26th day of November, 2024.

Signed By:
*Robert E. Wier*  /s/ REW
United States District Judge

---

[6] Movant offered some discussions of conditions at Butner and some references to his own rehabilitation. The Court acknowledges the content but does not view either as significant to the decision or as warranting further elaboration in the decision. Butner is not the housing location at issue. The Court hopes that Iossifov has bettered himself through programming. Such steps do not, on this record, move the needle appreciably toward reduction.